IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| EDWARD G., ) | |
| ) | |
|    Plaintiff, ) | |
| ) | No. 21-cv-1872 |
| v. ) | |
| ) | Magistrate Judge Jeffrey I. Cummings |
| KILOLO KIJAKAZI,[1] ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
|    **Defendant.** ) | |

## AMENDED MEMORANDUM OPINION AND ORDER

Edward G. ("Claimant") brings a motion for summary judgment to reverse the final decision of the Commissioner of Social Security ("Commissioner") denying his claim for a Period of Disability and Disability Insurance Benefits ("DIBs"). (Dckt. #17). The Commissioner responds with a cross-motion for summary judgment seeking to uphold the decision to deny benefits. (Dckt. #22). The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. §636(c). This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. §405(g). As explained below, Claimant's motion for summary judgment is denied and the Commissioner's motion for summary judgment is granted.

**I. BACKGROUND**

    **A. Procedural History**

Claimant filed an application for a period of disability and DIBs on March 9, 2016, alleging disability beginning October 15, 2013, through June 30, 2014, the date of last insured, due to high blood pressure; osteoarthritis, including in the back, ankles, and left knee; and mitral

---

[1] In accordance with Internal Operating Procedure 22 - Privacy in Social Security Opinions, the Court refers to Claimant only by her first name and the first initial of her last name. Acting Commissioner of Social Security Kilolo Kijakazi has also been substituted as the named defendant. Fed.R.Civ.P. 25(d).

1

valve prolapse. (Administrative Record ("R.") 14, 346). Claimant's application was denied initially and upon reconsideration. Claimant filed a timely request for a hearing, which was held October 19, 2017 in front of Administrative Law Judge ("ALJ") Deborah Ellis. ALJ Ellis issued a written decision on March 8, 2018. (R. 173-94). Claimant filed a timely request for review with the Appeals Council, which, on December 11, 2019, remanded based on a challenge under the Appointments Clause for a new hearing in front of a different ALJ. (R. 195-98). Claimant's case was heard anew before ALJ Gregory Smith on April 6, 2020. (R. 80-104). On May 4, 2020, ALJ Smith issued a written decision again denying Claimant's application for benefits. (R. 8-26). Claimant filed another request for review with the Appeals Council, which denied that request on February 8, 2021, (R. 1-7), rendering the ALJ's decision the Commissioner's final decision. This action followed.

### B. The Standard for Proof of Disability Under the Social Security Act

In order to qualify for disability benefits, a claimant must demonstrate that he is disabled. An individual does so by showing that he cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). Gainful activity is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. §404.1572(b).

The Social Security Administration ("SSA") applies a five-step analysis to disability claims. 20 C.F.R. §404.1520. The SSA first considers whether the claimant has engaged in substantial gainful activity during the claimed period of disability. 20 C.F.R. §404.1520(a)(4)(i). At step two, the ALJ determines whether a claimant has one or more medically determinable physical or mental impairments. 20 C.F.R. §404.1521. An impairment "must result from

2

anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques." *Id.* In other words, a physical or mental impairment "must be established by objective medical evidence from an acceptable medical source." *Id.*; *Shirley R. v. Saul*, 1:18-cv-00429-JVB, 2019 WL 5418118, at *2 (N.D.Ind. Oct. 22, 2019). If a claimant establishes that he has one or more physical or mental impairments, the ALJ then determines whether the impairment(s) standing alone, or in combination, are severe and meet the twelve-month duration requirement noted above. 20 C.F.R. §404.1520(a)(4)(ii).

At step three, the SSA compares the impairment or combination of impairments found at step two to a list of impairments identified in the regulations ("the listings"). The specific criteria that must be met to satisfy a listing are described in Appendix 1 of the regulations. 20 C.F.R. Pt. 404, Subpt. P, App. 1. If the claimant's impairments meet or "medically equal" a listing, he is considered to be disabled, and the analysis concludes. If the listing is not met, the analysis proceeds to step four. 20 C.F.R. §404.1520(a)(4)(iii).

Before addressing the fourth step, the SSA must assess a claimant's residual functional capacity ("RFC"), which defines his exertional and non-exertional capacity to work despite the limitations imposed by her impairments. The SSA then determines at step four whether the claimant is able to engage in any of his past relevant work. 20 C.F.R. §404.1520(a)(4)(iv). If the claimant can do so, he is not disabled. *Id*. If the claimant cannot undertake his past work, the SSA proceeds to step five to determine whether a substantial number of jobs exist that the claimant can perform in light of his RFC, age, education, and work experience. An individual is not disabled if he can do work that is available under this standard. 20 C.F.R. §404.1520(a)(4)(v).

### C. The Evidence Presented to the ALJ

Claimant, who was fifty-three-years-old at the onset of his alleged disability, is a former cabinet maker who seeks a period of disability and DIBs due to high blood pressure; osteoarthritis, including in the back, ankles, and left knee; and mitral valve prolapse. (Dckt. #17 at 2). Claimant alleges an onset date of October 15, 2013. Claimant's earnings records show that he had acquired sufficient quarters of coverage to remain insured through June 30, 2014 and he must prove that his disability arose before that date. (R. 12); *Shideler v. Astrue*, 688 F.3d 308, 311 (7th Cir. 2012) ("[W]hatever condition claimant may be in at his hearing, the claimant must establish that he was disabled before the expiration of his insured status."). He presented the following relevant evidence to the ALJ in support of his claim.

#### 1. Evidence from Claimant's Medical Record

The record reveals that Claimant suffered an ankle and foot injury after being struck by a car when he was six years old. (R. 88). The injuries were severe enough to require surgery. (R. 535).

On March 5, 2009, Claimant presented to Hugh O'Neill, M.D., at Palos Community Hospital's Emergency Department complaining of chest discomfort. (R. 535, 548). Claimant underwent an echocardiogram, was diagnosed with hypertension, and released. (R. 535-39). Claimant was diagnosed with bicuspid aortic valve with moderate aortic insufficiency as well as hypertension on October 13, 2009. (R. 620). From March 4, 2010, through May 14, 2013, Claimant made fifteen visits to several doctors: primary care physicians, including Dr. Daniel Desimone; cardiologists, including Dr. Christopher Sullivan; various emergency departments; and one infectious disease consultation; he often complained of issues with movement and palpitations. (*See, e.g.*, R. 579-82, 584-87, 591, 613-19, 646, 654, 680, 690-93). Claimant's

4

back pain and hypertension symptoms were consistent yet stable via numerous pain medications, including Norco (which he used following two pain flare-ups on September 20, 2011, and May 14, 2013). (*Id*.). Most of Claimant's visits with his cardiologist, Dr. Sullivan, were check-ups, during which Claimant reported no complaints. (R. 591-95, 613, 616-19). On May 14, 2013, a few months prior to Claimant's alleged onset of disability, he presented to Dr. Desimone with back pain. (R. 680-81). Dr. Desimone noted back spasms for which he prescribed home exercise and medications, including Norco, as needed for pain relief. (R. 681). He advised Claimant to follow up "if no improvement or if symptoms worsen." (*Id.*). Claimant did not follow up with Dr. Desimone regarding these symptoms for seventeen months.

Claimant went to only three medical appointments between October 15, 2013 and June 30, 2014 – his alleged period of disability. (R. 643-44, 674-75, 1955). First, on October 30, 2013, Claimant presented to Dr. Desimone complaining of congestion and was diagnosed with acute sinusitis. (R. 643-44). Dr. Desimone observed no chest pain, shortness of breath, or swelling of Claimant's extremities. (R. 644). Claimant reported no other symptoms and was sent home with medication. (*Id*.). Three months later, on February 3, 2014, Claimant followed up with Dr. Desimone for a prescription refill related to his sinus issues. (R. 673). Dr. Desimone made no cardiovascular or musculoskeletal findings of note and prescribed a Zpak and Nasonex for Claimant's congestion. (R. 674-75). Claimant's third and final visit during this period was on March 6, 2014, when he reported to Ingalls Tinley Park Primary Care after he fell and injured his elbow. (R. 1955). Kia Boxley-Gillespie, M.D., observed Claimant's heart and extremities to be normal, gave Claimant a splint for his injury, and released him. (R. 1959-60).

Claimant did not see another physician until December 2, 2015 – over seventeen months after the end of his alleged period of disability – when he presented to Dr. Desimone with

5

complaints of pain related to a "heavy lifting" injury. (R. 629-30). After examination, he was released with pain medication. (*Id*.). The record shows nine subsequent medical visits through December 3, 2018, of which the following are noteworthy: (1) on April 15th, 2016, Claimant received a walking boot for left ankle pain and degeneration, (R. 1114); (2) on April 24, 2017, Claimant noted he started wearing an ankle brace that helped his pain and movement, (R. 1115); on November 4, 2017, Claimant presented to Palos Hospital complaining of heart palpitations but was released after doctors observed regular heart rate and rhythm. (R. 1555-59).

### 2. Opinion Evidence from State Agency Reviewing Physicians

On April 4, 2016, Michael Nenaber, M.D., reviewed Claimant's medical records and assessed his RFC as of June 30, 2014, his date last insured. (R. 155-58). Dr. Nenaber noted Claimant's history of hypertension and sinusitis and that Claimant's doctors' visits on March 27, 2013 and February 3, 2014 showed good strength in extremities, aortic insufficiency but good heart sound and rhythm. (R. 156). Dr. Nenaber stated "[t]here is no indication that there is medical or other opinion evidence" related to Claimant's medically determinable impairments or symptoms for the adjudicative period. (R. 153-54). Based on his review, Dr. Nenaber opined that Claimant could sustain light work and therefore could not perform his past work as a cabinet maker. (R. 157). Dr. Nenaber found that Claimant could frequently lift or carry ten pounds; stand, walk, or sit for about six hours in an eight-hour workday; frequently climb ramps or stairs; frequently balance, stoop, kneel, crouch, or crawl; and occasionally climb ladders, ropes, or scaffolds; and should avoid concentrated exposure to physical hazards. (R. 155-56). He further found that Claimant was not disabled. (R.158).

Vidya Madala, M.D., reviewed Claimant's records at the reconsideration level on June 3, 2016 and also opined on Claimant's RFC before his date last insured. (R. 170). Dr. Madala

6

summarized Claimant's history of hypertension and sinusitis and expanded his review of Claimant's medical history to 2009. (R. 168). Dr. Madala remarked that Claimant denied chest pain and pressure, and his echocardiograms between 2010 and 2014 showed moderate aortic insufficiencies. (*Id*.). While Claimant complained of back pain "for a few days" in 2009 and 2013, Dr. Madala observed that he undertook no treatment for those conditions. (R. 169). Dr. Madala noted that Claimant undertook no treatment for his alleged osteoarthritis in his back and joints prior to his date last insured and that there was "no indication that there is opinion evidence from any source" related to his impairments. (R. 169). Dr. Madala concluded that Claimant had an RFC for medium work which precluded him from his past work as a cabinet maker. (R. 170). Dr. Madala also concluded that Claimant was not disabled. (*Id*.).

### 3. Evidence from Claimant's Testimony

Claimant appeared with counsel at the April 16, 2020 hearing. Claimant testified that he lived with his wife, son, and father in a split-level home. (R. 36-37). He explained that he drives without restrictions but did not drive to the hearing that day. (R. 39). Claimant's most recent full-time job was making custom cabinets for C-V Cabinets. (R. 41). His work required him to use blueprints, lift between fifty to one-hundred pounds of wood every day and stand most of the workday. (R. 43). Claimant also played bass guitar in a band that performed monthly shows. (R. 44). According to Claimant, he stopped working as a cabinet maker in 2009, despite medical records indicating he described himself as employed in late 2015. (R. 45).

Claimant stated his foot issues arose from an injury in 1966 that began to further deteriorate in 2014. (R. 54-55). However, Claimant could not recall why he did not have surgery on his foot when his problems worsened. (*Id*.). Claimant further testified that he went to an emergency room in December 2015 after injuring himself lifting music equipment, including

7

amplifiers and speakers, the night before. (R. 45-46). Claimant stated that he was taking Norvasc for high blood pressure and ibuprofen for pain every day in 2014 but did not remember taking Norco at that time. (R. 48-49). Claimant recalled visiting a doctor for his back pain, but instead of getting further treatment, he took his prescriptions. (R. 51). Claimant spent his time taking care of the house and working on music on his computer while his wife worked. (*Id*.).

When asked about his current condition, Claimant stated his primary impairment was that his mitral valve prolapse caused shortness of breath with minor exertion. (R. 58). For example, Claimant stated he could not stand long enough to cook, walk more than ten minutes without issue, and has worsening pain in his foot necessitating use of a cane. (R. 59-60). Notably, however, he had not seen a cardiologist in two years. (R. 58).

### 4. Evidence from Vocational Expert's Testimony

The Vocational Expert ("VE") testified that Claimant previously worked as a cabinet maker, a skilled position with specific vocational preparation of six, described in the Dictionary of Occupational Titles ("DOT") as medium, but performed as heavy by Claimant. (R. 97). The VE then stated that an individual of Claimant's age, education, and work experience, who could: occasionally climb ramps, stairs, ladders, ropes, scaffolds; frequently balance, stoop, kneel, crouch, and crawl; and could occasionally work in unprotected heights and work with moving mechanical parts, could not perform his past job as a cabinet maker. (R. 98).

The ALJ then asked the VE whether there were jobs available in the national economy that an individual with the above RFC could perform. (*Id*.). The VE testified that although none of Claimant's cabinet-making skillset would transfer to light, skilled work, there was a "large portion" of light, unskilled, nationally available jobs that the individual could perform, such as bench assembler (27,100 nationally-available jobs); electronics worker (19,200 jobs); and

8

routing clerk (26,200 jobs). (R. 98-99). The VE stated that if a person was only able to stand or walk for two hours, that individual would be limited to sedentary work. (R. 99).

### D. The ALJ's Decision

The issue before the ALJ was whether Claimant was disabled during the eight-month period between the alleged onset date of October 15, 2013 and his date last insured, June 30, 2014. The ALJ applied the five-step inquiry required by the Act in reaching his decision to deny Claimant's request for benefits.

At step one, the ALJ found that Claimant had not engaged in substantial gainful activity during the alleged disability period. (R. 14). At step two, the ALJ determined that Claimant suffered from the severe impairments of aortic insufficiency, diastolic prolapse of the aortic valve, valvular aortic stenosis, left ankle degenerative joint disease, obesity, and hypertension. (*Id.*). At step three, the ALJ concluded that none of Claimant's impairments or combination of impairments met or medically equaled one of the Commissioner's listed impairments, including listings 1.02 (major dysfunction of a joint), 4.02 (chronic heart failure), 4.04 (ischemic heart disease), 4.05 (recurrent arrhythmias), 4.06 (symptomatic congenital heart disease), or 4.11 (chronic venous insufficiency). (R. 14-15). In reaching his step three conclusion, the ALJ relied upon the opinions of the State agency consultative physicians, who concurred in finding Claimant's impairments did not meet any listings. (R. 14).

Before turning to step four, the ALJ determined that Claimant had the RFC to perform light work as defined in 20 C.F.R. §404.1567(b), except that Claimant could occasionally climb ramps and stairs; occasionally climb ladders, ropes, or scaffolds; frequently balance, stoop, kneel, crouch, and crawl; and occasionally work at unprotected heights and with moving mechanical parts. (R. 16). In formulating the RFC, the ALJ gave "considerable weight" to the State agency medical opinions, "with more weight being given to the initial determination as it

9

more closely relates to the claimant's condition in 2013 and 2014." (R. 18). At step four, the ALJ found that Claimant could not perform his past relevant work as a cabinet maker. (R. 19).

The ALJ turned to step five and found that, through the date last insured, and in consideration of Claimant's age, education, work experience, and residual functional capacity, jobs existed in significant numbers in the national economy that Claimant could have performed. (R. 19). The ALJ considered Claimant's limitations in conjunction with the Medical-Vocational Guidelines at 20 C.F.R. Pt. 404, Subpt. P, App. 2. (R. 19-20). Based on the VE's testimony at Claimant's hearing, the ALJ concluded that Claimant could make a successful adjustment to other work that existed in significant numbers in the national economy, including bench assembler (DOT #706.684-042), electronics worker (DOT #726.687-010), and routing clerk (DOT #222.687-022). (R. 20). Accordingly, he found Claimant was "not disabled" between his alleged onset of disability, October 15, 2013, and his date last insured, June 30, 2014. (*Id.*).

## II.     STANDARD OF REVIEW

A claimant who is found to be "not disabled" may challenge the Commissioner's final decision in federal court. Judicial review of an ALJ's decision is governed by 42 U.S.C. §405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). "Substantial evidence is not a high threshold: it means only 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Karr v. Saul*, 989 F.3d 508, 511 (7th Cir. 2021), *quoting Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (internal quotation marks omitted). The Commissioner's decision must also be based on the proper legal criteria and free from legal error. *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

A court reviews the entire record, but it does not displace the ALJ's judgment by reweighing the facts, resolving conflicts, deciding credibility questions, making independent symptom evaluations, or otherwise substituting its judgment for that of the Commissioner. *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011); *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Instead, the court determines whether the ALJ articulated an "accurate and logical bridge" from the evidence to her conclusions. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). This requirement is designed to allow a reviewing court to "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). Thus, even if reasonable minds could differ as to whether the claimant is disabled, courts will affirm a decision if the ALJ's opinion is adequately explained and supported by substantial evidence. *Elder*, 529 F.3d at 413 (citation omitted).

### III. ANALYSIS

Claimant's sole argument in support of remand is that substantial evidence did not support the ALJ's RFC determination. (Dckt. #17 at 8). An ALJ's RFC findings are intended to capture "the most [a claimant] can still do despite [his] limitations." 20 C.F.R. §416.945(a)(1); *see also Moon v. Colvin*, 763 F.3d 718, 720 (7th Cir. 2014) ("Residual functional capacity is the extent to which a person can still work despite having health problems."). ALJs are granted latitude in their RFC determinations so long as their findings "convey[] in some way the restrictions necessary to address a claimant's limitations." *Recha v. Saul*, 843 Fed.Appx. 1, 4 (7th Cir. 2021). In other words, the question is "whether an ALJ's decision adequately accounts for an applicant's limitations against the evidence in the record before the ALJ." (*Id.*). For the reasons stated below, this Court disagrees with Claimant's assertion and finds that the ALJ's RFC analysis is supported by substantial evidence.

11

### A. The ALJ's decision to give considerable weight to the opinions of the State Agency Physicians is supported by substantial evidence.

As the Commissioner notes, the ALJ relied on the opinions of the two state agency physicians when formulating Claimant's RFC and finding that he was able to perform light work with noted limitations. (R. 17-19). The Seventh Circuit has made clear that ALJs are "entitled to rely upon the[] opinions" of State agency physicians when determining a claimant's RFC. *Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004); *Grotts v. Kijakazi*, 27 F.4th 1273, 1278 (7th Cir. 2022), *quoting* 20 C.F.R. §404.1513a(b)(1) ("[W]e note that the regulations consider state agency psychologists . . . to be 'highly qualified and experts in Social Security disability evaluation.'"); *Mason v. Colvin*, No. 13 C 2993, 2014 WL 5475480, at *7 (N.D.Ill. Oct 29, 2014) ("[T]he opinion of a non-examining state agency consultant is the type of medical evidence that an ALJ may rely upon to craft a claimant's RFC.") (citing *Rice*, 384 F.3d at 370). Moreover, ALJs need only "minimally articulate [their] reasoning for crediting the opinions of non-treating state agency physicians." *Grotts*, 27 F.4th at 1278. Here, the ALJ met this standard by recapping the agency physicians' opinions and giving them "considerable weight, with more weight being given to the initial determination as it more closely relates to the claimant's condition in 2013 and 2014" (*i.e.*, during the alleged disability period). (R. 18).

Finally, even if the ALJ's decision to rely on the state agency physicians' opinions was arguably mistaken, Claimant failed to object to this aspect of the ALJ's decision in his opening brief and he has thereby waived any challenge concerning the issue. *See, e.g.*, *Fetting v. Kijakazi*, 62 F.4th 332, 338 (7th Cir. 2023).[2]

---

[2] Claimant has likewise failed to challenge the ALJ's decision to give "little weight" to a September 29, 2017 opinion by his podiatrist, Haytham Mansour DPM, Ph.D., who started treating Claimant in April 2016 and noted that the symptoms and limitations he observed emerged in January 2016. (R. 17, 927-31).

### B. The ALJ's RFC assessment did not fail to incorporate evidence of the limitations that Claimant had during the disability period.

Claimant asserts that the ALJ did not properly incorporate all of the evidence of his limitations into the RFC assessment. (Dckt. #17 at 9). However, Claimant relies almost entirely on evidence that either pre-dated or post-dated the disability period (October 15, 2013 and June 30, 2014). (*See* Dckt. #17 at 9-11). While an ALJ should consider the record as a whole, it is well-settled that evidence which pre-dates or post-dates a claimant's disability period is relevant to the disability determination only to the extent that such evidence is probative of the claimant's conditions and impairments during the disability period. *See, e.g.*, *Million v. Astrue*, 260 Fed.Appx. 918, 921-22 (7th Cir. 2008) ("Records from medical treatment that took place after Million's last date insured . . ., are relevant only to the degree that they shed light on her impairments and disabilities from the relevant insured period."); *McHenry v. Berryhill*, 911 F.3d 866, 872 (7th Cir. 2018) ("A medical advisor's retrospective diagnosis may be considered only if corroborated by evidence contemporaneous with the period of eligibility.") (internal quotation marks omitted); *Stepp v. Colvin*, 795 F.3d 711, 719 (7th Cir. 2015) ("Because this assessment [that claimant was unable to work] and the anticipated date of [his] return to work both predated the alleged onset of [claimant's] disability . . ., we do not find the assessment particularly probative of [claimant's] condition during the adjudicative period.").

Here, the ALJ summarized Claimant's medical history, including his medical records from before, during, and after the eight-month disability period. (R. 16-19). The ALJ found that the records from Claimant's medical treatment within the disability period[3] provide no indication that Claimant's "severe impairments" (namely, aortic insufficiency; diastolic prolapse of the

---

[3] The records from Claimant's three medical appointments on October 20, 2013, February 3, 2014, and March 6, 2014 that were within the disability period are discussed above in Section I(C)(1).

13

aortic valve; valvular aortic stenosis; left ankle degenerative joint disease; obesity; and hypertension) were disabling conditions at that time. (R. 18). In particular, the ALJ found:

> The [C]laimant's treatment during the **relevant period** was generally conservative and routine and the objective findings were consistently minimal. The [C]laimant testified to needing to elevate his right foot due to swelling, but there is nothing in the record during the relevant period from any of his doctors stating the same. Regarding the [C]laimant's cardiac problems, the treatment he received during the relevant period was sparse, and any treatment he did receive was generally successful in controlling his symptoms. As of March 2013, he showed no signs or symptoms of angina or congestive heart failure, and treatment notes from October 2013 demonstrate normal cardiovascular exam and no swelling of his lower extremities.

(R. 18) (emphasis in original). Consequently, the pre- and post-disability period evidence that Claimant relies upon to show that he is disabled is insufficient to warrant remand because it is not corroborated by "evidence contemporaneous with the period of eligibility." *McHenry*, 911 F.3d at 872.[4]

Finally, Claimant's assertion that "the evidence is *more* consistent with sedentary work," (Dckt. #17 at 11), is unavailing. Even if this Court were to find the ALJ's RFC finding is *less* consistent with the evidence, such a finding would not require remand *unless* this Court also found that the ALJ's decision that Claimant can engage in light work lacks rational support in the record. As the Seventh Circuit has made clear:

> [A]n ALJ's job is to weigh conflicting evidence, and the loser in such a process is bound to believe that the finder of fact should have been more favorable to his cause. The substantial-evidence standard, however, asks whether the administrative decision is

---

[4] The ALJ's recognition that "it is reasonable to infer the [C]laimant's left ankle disorder was present prior to the date last insured, given the 2016 imaging showing [a] prior ankle fracture," does not change this conclusion. The mere presence of a disorder without evidence that that disorder is disabling does not entitle a claimant to an award of benefits. *See Gentle v. Barnhart*, 430 F.3d 865, 868 (7th Cir. 2005) ("Conditions must not be confused with disabilities. The social security disability program is not concerned with health as such, but rather with ability to engage in full-time gainful employment. A person can be depressed, anxious, and obese yet still perform full-time work."); *Thomas v. Astrue*, 352 Fed.Appx. 115, 116 (7th Cir. 2009). Thus, Claimant's focus on records showing that the condition of his ankle began to worsen to an arguably disabling status in 2016 (Dckt. #17 at 10-11) – long after his date last insured (June 30, 2014) – "does not provide a basis for granting benefits during the relevant time period." *Mackay v. Astrue*, No. 11 C 283, 2011 WL 6753848, at *13 n.8 (N.D.Ill. Dec. 22, 2011).

rationally supported, not whether it is correct (in the sense that federal judges would have reached the same conclusions on the same record).

*Sanders v. Colvin*, 600 Fed.Appx. 469, 470 (7th Cir. 2015); *Stepp*, 795 F.3d at 718 (the court's review is "very limited"). In other words, "if reasonable minds could differ concerning whether [Claimant] is disabled, we must nevertheless affirm the ALJ's decision if the decision is adequately supported." *Stepp*, 795 F.3d at 718 (internal quotation marks omitted).

In effect, Claimant seeks to have this Court re-weigh the evidence and modify the RFC by substituting its judgment for the ALJ's. The Court cannot, and will not, do so. *See, e.g.*, *McKinzey*, 641 F.3d at 889; *Elder*, 529 F.3d at 413. As discussed above, the ALJ considered the Claimant's medical history (including evidence outside of the disability period), opinion evidence, and hearing testimony, and he provided an "accurate and logical bridge" between the evidence and his RFC assessment. This satisfied the substantial evidence standard. *Karr*, 989 F.3d at 511; *Craft*, 539 F.3d at 673.

## CONCLUSION

For the foregoing reasons, Claimant's motion for summary judgment, (Dckt. #17), is denied and the Commissioner's motion for summary judgment, (Dckt. #22), is granted.

**Date: June 26, 2023**

**Nunc Pro Tunc Date:  June 22, 2023**

　　　　　　　　　　　　　　　　　　　　　　　　**Jeffrey I. Cummings**
　　　　　　　　　　　　　　　　　　　　　　　　**United States Magistrate Judge**